IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| *Plaintiff*, | § § | CIVIL ACTION No. 1:10CV240 |
| v. | § § | |
| JAMES A. SMITH ET AL., | § § | JUDGE RON CLARK |
| *Intervenor Plaintiffs*, | § § | |
| v. | § § | |
| WILHELMSEN SHIPS SERVICE, INC., | § § | |
| *Claimant*, | § § | |
| v. | § § | |
| SS CAPTAIN H.A. DOWNING, O.N. 1046031, its boilers, engines, machinery, masts, spars, rigging, boats, anchors, cables, chains, tackle, tools, bunkers, pumps and pumping equipment, apparel, furniture, fittings and equipment, spare parts, and all other appurtenances, etc., in rem; and AHL SHIPPING COMPANY, in personam, | § § § § § § § § § § § | |
| *Defendants*. | § § | |

**<u>MEMORANDUM OPINION ON CLAIM FOR UNPAID CONTRIBUTIONS TO
VACATION AND RETIREMENT PLANS</u>**

This is an in rem action involving competing claims against the vessel the CAPTAIN

H.A. DOWNING. The CAPTAIN H.A. DOWNING was owned by AMERICAN HEAVY LIFT

SHIPPING ("AHL"). The United States by and through the Secretary of Transportation, is the

1

mortgagee on a First Preferred Fleet Mortgage dated October 3, 1996, granted by AHL. When AHL defaulted on the mortgage, the United States filed suit for foreclosure on the vessel. The vessel was arrested on September 29, 2010. On June 18, 2010, AHL filed for bankruptcy. On August 23, 2010, the bankruptcy court entered an order abandoning the estate's interest in the SS CAPTAIN H.A. DOWNING.

On August 9, 2011, the United States Marshal's Service, acting on the court's behalf, sold the vessel at auction for $3,300,000.00. The court confirmed the sale on August 30, 2011. Intervenor Plaintiff Captain Timothy A. Brown as Chairman of the Board of Trustees of the Masters, Mates & Pilots Vacation Plan and Masters, Mates & Pilots Individual Retirement Account Plan asserts a claim on behalf of the individual crew members of the CAPTAIN H.A. DOWNING for unpaid contributions to the crew's vacation and individual retirement plans in the amounts of $34,104.33 and $56.045.65 respectively. Brown argues that these unpaid contributions constitute seamen wages and therefore he is entitled to priority.

A bench trial was held on the above claims against the vessel on October 5-7, 2011. After careful consideration of the parties' papers and proposed findings of fact, the testimony and arguments presented during the trial, and the applicable law, the court finds that the unpaid contributions owed to the vacation plan, but not those owed to the individual retirement account plan, are seamen's wages. Pursuant to Federal Rule of Procedure 52(a)(1), the court makes in addition to the findings stated on the record at the trial, the following findings of fact and conclusions of law.

## Law Applicable to Wages of the Crew

**Wages of seamen are protected**

In maritime law, wages is the compensation allowed to seamen for their services on board a vessel during a voyage. *Lakos v. Saliaris*, 116 F.2d 440, 442 (4th Cir. 1940). This includes not only base wages specified in the shipping articles but also overtime, extra wages, and bonuses. *Petersen v. Interocean Ships, Inc.*, 823 F.2d 334, 336 (9th Cir. 1987) quoting 1 M. Norris, The Law of Seamen § 12:1 (4th ed. 1985 at 426). The Penalty Wage Statute provides that at the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. 46 U.S.C. § 10313(f). The purpose of this statute is to protect seamen from the harsh consequences of the arbitrary and unscrupulous actions of their employers from placing a seaman ashore with little or no money in his pocket and threatening nonpayment as a means to force seamen to release the ship of all claims. *American Foreign S.S. Co. v. Matise*, 423 U.S. 150, 160, 96 S.Ct. 410, 416, 46 L.Ed. 2d 354 (1975); *Fanos v. Maersk line, Ltd.*, 246 F.Supp.2d 676, 680 (S.D. Tex. 2003); *Melanos v. Chandris*, 181 F.Supp. 189 (N.D. N.Y 1959).

In order to prevail in this priority dispute, Captain Brown must establish that the unpaid contributions owed to the Plans are wages included within the scope of 46 U.S.C.§ 10313. In making this determination, the court notes that a court in admiralty must be solicitous of the seaman. Seamen have traditionally been treated as wards of the courts of admiralty and their rights have been zealously protected. *Vaughan v. Atkinson*, 369 U.S. 527, 532, 82 S.Ct. 997, 1000, 8 L.Ed. 2d 88 (1962); *Bass v. Phoeniz Seadrill/78 Ltd.*, 749 F.2d 1154, 1160-61 (5th Cir.

1985). The laws of admiralty have been structured this way for hundreds of years so that seamen would be willing to undertake a dangerous occupation, which is beneficial and necessary for our country.

Accordingly, claims by seamen for wages have the highest priority over all other preferred liens and claims, subordinate only to the expenses of custodia legis.[1] *See* 46 U.S.C. § 31326; 46 U.S.C. § 31301(5); *United States v. One (1) 3354 Ft. Freighter M.V. Andoria*, 570 F. Supp. 413, 415 (E.D. La. 1983). Thus, wages of seamen occupy a unique status. *Brandon v. S.S. DENTON*, 302 F.2d 404, 416 (5th Cir. 1962). Seamen's wages are "sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages." *Id.* (quoting *The John G. Stevens*, 170 U.S. 113, 119, 18 S.Ct. 544, 547 (1898).

Seamen's compensation packages today, however, include various cash and non-cash benefits in addition to a base wage. *Petersen* 823 F.2d at 336. Therefore, "It [is] not always easy for courts to determine which of the many payments that the owner or master of a vessel may make to a seaman should properly be classified as wages." *Id.*

In maintenance and cure cases, courts generally consider paid vacation as part of a seaman's total wages. *Morel v. Sabine Towing & Transportation Co., Inc.,* 669 F.2d 345, 346 (5th Cir. 1982). Each day the seaman works he earns compensation payable in the form of a base wage plus an entitlement to paid vacation. *Id.* Because the seaman earns paid vacation based on his service on the vessel, paid vacation is an "inherent part of the seaman's wages." *Id.*

---

[1] A claim for wages is equal to a seaman's claim for maintenance and cure. *Fredelos v. Meritt-Chapman & Scott Corp.*, 447 F.2d 435 (5th Cir. 1971).

**Payments to a plan may be distinguished from "wages"**

Where contributions owed to seamen for vacation as well as other benefits such as for pension are paid to and commingled in union benefit plans, rather than to the seaman directly, courts have concluded that the contributions are not wages of the crew. The reasoning for these decisions is set out below.

1. There is no showing that the seaman suffered an actual loss from the employer's failure to contribute because the union guaranteed payment regardless of whether the employer contributed. *See West Winds Inc. v. M.V. RESOLUTE*, 720 F.2d 1097 (9th Cir. 1983); *Brandon v. Denton,* 203 F.2d 404 (5th Cir. 1962)*; Citibank v. VESSEL AMERICAN MAINE*, 865 F.2d 24 (2nd Cir. 1988).

2. Administrative fees and expenses of the union plans are borne to an extent out of the wages of the seamen, who do not receive one-hundred percent of the amount claimed as a lien. *Irving Trust Co. v. Golden SAIL,* 197 F. Supp. 777 (D. Oregon 1961); *Brandon ,* 203 F.2d at 404.

3. Payments to the plans were based on other factors which do not relate to a seaman's service on the vessel. *See Irving Trust,* 197 F. Supp. at 777(holding unpaid vacation, welfare and pension contributions are not wages of the crew because the contributions owed were a flat sum of $8 a day, and were not related to a seaman's hours, wages, or productivity); *Citibank*, 865 F.2d at 24 (holding seamen's realization of his benefits were dependent upon several factors unrelated to a seaman's actual service including: employee forfeitures, administrative costs of the trust, and trustee discretion and control of the funds).

4. Contributions were due the trustees, not the seaman and the trustees had complete control over the funds. *Irving Trust*, 197 F. Supp. at 777; *Brandon*, 203 F.2d at 415.

5. Unpaid contributions to union trust funds are not wages because there is nothing to connect a particular wage paid with a particular employee. *Irving Trust*, 197 F. Supp. at 777; *Brandon*, 203 F.2d at 415; *Citibank*, 865 F.2d at 24.

6. Such unpaid compensation cannot be converted to a cash equivalent. *West Winds*, 720 F.2d at 1097(holding contributions are not wages because the value which they may ultimately confer upon a seaman will vary according to uncertain factors such as the accumulation of trust funds, the amount of investment gains or losses, and employees' needs) *Citibank,* 865 F.2d at 24 (stating a seaman's realization of his Money Purchase Benefit is dependent upon several different factors such as investment losses, administrative costs and expenses of the trust, fees for professional consultants which prevent calculation of the present value of the benefit).

7. Unpaid contributions are not wages because the value of the benefit that the employees will ultimately receive is speculative—it is based on uncertain future events. *Prudential Ins v. U.S. Lines Inc*., 915 F.2d 411 (9th Cir. 1990).

For the court to hold in this case that the unpaid contributions to the Vacation and Individual Retirement Account Plans are wages, the plans at issue would have to be distinguished from the plans analyzed in previous cases. In addition, to determine whether the contributions to the Union Plans are wages, the court will consider two questions*. Fanos v. Maersk Line Ltd.*, 246 F.Supp.2d 676, 681 (S.D. Tex. 2003) citing *Petersen*., 823 F.2d at 336.

First, is the payment for services rendered to the ship? *Id.* Whether vacation pay is compensation for services rendered to the ship depends on when and how the payment is made. *Id.(citing Mateo v. M/S KISO,* 805 F.Supp. 761, 780-81 for proposition that vacation pay payable

during or immediately following the completion of plaintiffs' service was a wage under the Wage Penalty Statute).

Second, does the payment permit practices that the seamen's wage statutes were intended to prevent (placing the seaman ashore without first paying him his base wages earned during the voyage)? *Id.* In determining whether the payment owed is wages, the "wage statutes are to be liberally construed to maximize protection of seamen." *Id.*

### Findings of Fact Concerning Both Plans

1. Captain Timothy A. Brown is the Chairman of the Board of Trustees of the Masters, Mates & Pilots Vacation Plan ("Vacation Plan") and the Masters, Mates & Pilots Individual Retirement Account Plan ("IRA Plan").

2. American Heavy Lift Shipping ("AHL") was the employer of the seamen who served on the CAPTAIN H.A. DOWNING.

3. Under the Collective Bargaining Agreement between the Masters, Mates & Pilots ("MM&P") and AHL, crew members were paid their regular and overtime wages by AHL for working on their vessels. AHL was also required to pay certain amounts for each crew member to the MM&P Benefit Plans.

4. These Benefit Plans include: a) vacation plan; b) individual retirement account plan; c) pension plan; d) health and benefit plan; e) Joint Employment Committee; f) M.A.T.E.S. Program; g) MIRAID; and h) drug testing program.

5. Intervening Plaintiff seeks only payments owed to the Vacation and IRA Plans.

**Findings of Fact Concerning the Vacation Plan**

1. Under the Collective Bargaining Agreement entered into between AHL and the MM&P, Vacation Benefits are due the MM&P Vacation Plan by the contributing employer covering the period of employment for which vacation is claimed.

2. AHL, however, is liable directly to the employee for the payment of delinquent vacation benefits. (Brown Exhibit 1 at 34; Brown Exhibit 2 at 29 ).

3. Employees may assign their claims against AHL to the MM&P Plan which shall assert such claim against AHL on behalf of the employee.

4. Per the terms of the Collective Bargaining Agreement, AHL agreed that vacation pay would be construed and paid as wages: "the company agrees that vacation pay will be due in the same manner as other wages and shall be considered wages for the purposes of the Articles." (Brown Exhibit 1 at 34; Brown Exhibit 2 at 29).

5. Payments to the Vacation Plan are based entirely on the time a seaman spends onboard the ship. Payments to the Vacation Plan are calculated as a set percentage of days worked on the vessel. (As of January 1, 2009, and thereafter, a licensed officer receives 26 paid vacation days for every 30 day worked; A bosun receives 21 paid vacation days for each 30 days worked; and all other crewmembers, receive 19 paid vacation days for each 30 days worked.) (Brown Exhibit 1 at 2; Brown Exhibit 2 at 22).

6. AHL was required to make the calculated vacation payments and then an additional contribution of 5.8% of each annual vacation contribution for FICA and overall administrative expenses. This additional contribution does not come out of the employee's calculated vacation payments.

7. The MM&P collected vacation funds from multiple employers, including AHL.

8. Once AHL made payments to the Vacation Plan, the MM&P placed these funds in twenty-four hour government securities.

9. The purpose of this investment plan was to ensure funds were immediately available upon the request of a crew member.

10. Union crew members may collect their vacation pay from any plan office the moment they depart the vessel, provided their employer has made the vacation contribution.

11. Union crew members will receive vacation payments only if their employer has made the contribution. If an employer fails to make the required vacation contribution, employees will receive no vacation payments.

12. The rule allowing employees to receive vacation payments only if the employer makes the vacation contribution was adopted in early 1987 to protect the solvency of the Plans.

13. The Vacation Plan is distinguishable from health plan payments where members receive health benefits whether or not the employer made the health contribution.

14. A total of $34,104.33 is owed by AHL as unpaid Vacation Plan payments for March and April 2010 for crew members who served onboard the SS CAPTAIN H.A. DOWNING.

15. A total of $2,428.39 is owed by AHL as Employer Payroll FICA tax on behalf of the crew members.

16. Although this additional contribution of $2,428.39 usually covers the administrative expenses of the plans, there is no extra money here for administrative fees to the plan. The entire sum will be paid to the IRS on behalf of each individual crew member as taxes on vacation payments received.

**Application of law to findings of fact concerning the Vacation Plan**

For the reasons set out below, the court finds the MM&P Vacation Plan is distinguishable from the plans analyzed in prior cases and therefore finds that these amounts are entitled to priority as wages of the crew.

Under the collective bargaining agreement, Vacation benefits are payable to the seaman only after contributions are made to the MM&P Vacation Plan by the contributing employer. Therefore, the seamen here will only be paid their vacation pay if AHL makes all of its required payments to the Vacation Plan and/or that amount is recovered from the sale proceeds of the SS CAPTAIN H.A. DOWNING. The fact that the seamen on board the SS CAPTAIN H.A. DOWNING will suffer a direct loss as a result of their employer's failure to contribute distinguishes this Plan from the plans at issue in *Brandon,* 203 F.2d at 404, and *Citibank*, 865 F.2d at 24 where the trustees paid the seamen the money owed regardless of whether the employer made the contribution.

Under the MM&P Vacation Plan, payments to the seamen are based entirely on service to the vessel. Such payments are calculated as a set percentage of each individual seaman's wages. This distinguishes the Vacation Plan from the plans at issue in *Irving Trust*, 197 F. Supp. at 777 and *Citibank,* 865 F.2d at 24 where payments to the plan were a flat fee or based on other factors such as employee forfeitures and trustee discretion which did not relate to the seaman's service on the vessel. It is also distinguishes this plan from the plan at issue in *West Winds*, 720 F.2d at 1097 where seamen received health benefits based on whether they fell ill, a factor entirely unrelated to a seaman's service.

Several courts have focused on the fact that the plans pay administrative expenses out of the amount owed to the seamen. In the case of the MM&P Vacation plan, however, there are no administrative fees or expenses of the union's plans deducted from the amounts owed to the seamen for vacation pay. Their employer simply makes an additional contribution to cover FICA taxes as well as the plan's administrative fee. This is different than plans considered by other courts where administrative expenses are deducted from the amounts contributed by the employer. In these plans the seamen did not receive one-hundred percent of the payments they were entitled to receive. *Irving Trust*, 197 F. Supp. at 777; *Brandon,* 203 F.2d at 404.

With the MM&P Vacation Plan, the employer is directly liable to the seaman not the trustee. The seaman then has the option of assigning his claim to the MM&P Vacation Plan to collect the delinquent contribution. This distinguishes the plan at issue from the plans in *Irving Trust* 197 F. Supp. at 777 and *Brandon,* 203 F.2d at 404 where payments were made directly to the trustees and the seamen had no legal interest in them.

The MM&P Vacation Plans are directly connected to each individual seaman. The plans are paid, identified, and classified by social security number. This distinguishes the MM&P Vacation Plan from the plan at issue in *Brandon*, 203 F.2d at 404 and *Citibank*, 865 F.2d at 24 where there was nothing to connect the particular wage paid to a particular employee.

The value owed to the seamen in the MM&P Vacation Plans does not vary by investment. The Vacation Plan funds are invested in very short term, twenty-four hour government securities because the seaman is entitled to withdraw the amount he earned based on his wage regardless of market fluctuations. If the Plan makes a profit with the investment, the profit goes to the plan; however, if the Plan sustains a loss on the investment, the Plan still has to pay the seaman his

11

earned contribution. This distinguishes the MM&P Vacation Plan from the plan in *Westwinds*, 720 F.2d at 1097 where the court held that the unpaid contributions were not wages because the value varied based on investment gains or losses.

There is no uncertainty as to the amounts of earned vacation pay owed to the crew for their service onboard the SS CAPTAIN H.A. DOWNING for March and April 2010. Exhibit 3 lists each crew member's name, social security number, ranking onboard the vessel and the amounts owed to him for vacation benefits. These amounts have been calculated down to the penny by Mr. Ken Ryan, the Benefits Director of the MM&P Plans. This differentiates the MM&P Vacation Plan from the plans at issue in *Citibank*, 865 F.2d at 24 where the plans were not easily converted to their present-day cash equivalent and *Prudential*, 915 F.2d at 411 where the value the benefit that the employees would ultimately receive was speculative.

Accordingly, the court finds the MM&P Vacation Plan can be distinguished from plans analyzed by other courts. The court also finds that the MM&P Vacation Plan passes the two part test set forth by the Ninth Circuit in *Petersen*, 823 F.2d 334 at 336 discussed in *Fanos*, 246 F. Supp.2d at 676.

In answering the first question posed in *Petersen,* the court should consider when and how the payment is made. Here, seamen can withdraw their vacation payments immediately upon leaving the ship. The fact that vacation pay is payable immediately following completion of plaintiff's service indicates that such payments are compensation for services rendered. As to the second part of the *Petersen test*, characterizing the MM&P vacation payments as wages prevents the evil that the wage statutes intended to prevent: placing the seaman ashore without first paying him his wages earned during the voyage.

Accordingly, the court concludes that Captain Brown, on behalf of the individual crew members of the SS CAPTAIN H.A. DOWNING is entitled to a preferred maritime lien for "wages of the crew of the vessel" in the form of unpaid vacation pay in the amount of $34,175.98 ($31,747.59 as unpaid vacation contributions owed to the individual crew members and $2,428.39 in FICA Tax to be paid to the Internal Revenue Service on behalf of each crew member).

The claim of Captain Brown for 'wages of the crew of the vessel" outrank in priority the claim of the United States Government for its preferred ship mortgage. *See* 46 U.S.C. § 31326; 46 U.S.C. § 31301(5); *United States v. One (1) 3354 Ft. Freighter M.V. Andoria*, 570 F. Supp. 413, 415 (E.D. La. 1983).

## Findings of Fact Concerning the IRA Plan

1. Under the collective bargaining agreement, AHL is required to contribute to the MM&P IRA Plan on behalf of each of the seamen working onboard the SS CAPTAIN H.A. DOWNING.

2. The contribution amount under the Collective Bargaining Agreement equals 5% of a licensed seaman's base wage rate and 15% of an unlicensed seaman's base wage rate.

3. The IRA Plan provides each member with the ability to self-direct the investment of their account funds into 15 different mutual funds provided by the Vanguard Group. Members are also provided with the option of having their account funds invested for them by the IRA Plan Trustees.

4. A total of 15 crew members onboard the SS CAPTAIN H.A. DOWNING elected to self-direct the investment of their IRA Plan account funds.

5. The rest of the crew members opted for the IRA Plan Trustees to invest their account funds.

6. The funds of the non self-directing seamen are pooled into 2 different mutual funds; however, all of the contributions are accounted for by the social security number for each crew member.

7. IRA benefits vest after 90 days of covered employment served in 2 separate calendar years and completed within a 5 or 6 year time frame.

8. Upon retirement or when a crew member permanently leaves the maritime industry, the seaman whose IRA benefits have vested is entitled to the proceeds from his IRA Plan account.

9. In the event of death prior to retirement, the IRA balance is distributed to the crew member's beneficiary, who may elect to roll over the funds into a proper IRA or withdraw the funds and pay the tax and penalty associated with it.

10. Crew members may also elect to withdraw their vested IRA funds before retirement and pay tax and penalty on the funds.

11. The administrative expense of the IRA is paid once a year based on the annual expenses of the Plans. Members with more than $10,000 in their account pay a flat administrative fee. Members with less than $10,000 in their account pay a percentage of the Plan's expenses.

12. Shares belonging to the members are sold to pay for these administrative charges.

13. A total of $56,045.65 is owed by AHL for crew members who served onboard the SS CAPTAIN H.A. DOWNING for payments into the Individual Retirement Account Plan for IRA contributions earned from October 2009 through April 2010.

**Application of law to findings of fact concerning the Individual Retirement Account Plan**

For the reasons set out below, the court finds the MM&P IRA Plan is not distinguishable from plans analyzed in prior cases, and therefore the amounts owed to the IRA Plan are not wages of the crew.

With the MM&P IRA Plan, the ultimate benefit will vary based on several factors, including investment and an employee's needs. The ultimate realization of IRA benefits by the seaman is dependent on factors which are unrelated to a seaman's actual service on the vessel. This variance in benefits actually received is similar to the plans discussed in *West Winds*, 720 F.2d at 1097 and *Citibank*, 865 F.2d at 24.

With the MM&P IRA Plan, even vested IRA benefits cannot be easily converted to the present day cash equivalent. Although the Benefits Director of the Plans, Ken Ryan, calculated the present value due the Vanguard IRA fund; this value cannot be converted into the benefits employees will actually receive. Some employees may withdraw early based on personal or financial reasons and pay the tax penalties while other employees will wait until retirement before cashing out their IRA benefits. Because the value which will ultimately be received by the seamen is based on uncertain future events, the MM&P IRA Plan is not distinguishable from the plans at issue in *Citibank*, 865 F.2d at 24 and *Prudential*, 915 F.2d at 411.

Finally every year the MM&P IRA Plan trustees charge each individual IRA account an administrative fee. Therefore, the seamen do not receive one-hundred percent of their employer's contribution. This makes the MM&P IRA Plan indistinguishable from plans at issue in prior cases. The Fifth Circuit has explicitly held that contributions owed by an employer are

not wages of the crew when such contributions may be used for the purpose of paying administrative costs of the operation of the plan. *Brandon*, 302 F.2d at 416.

The court concludes that contributions owed to the MM&P IRA Plan are not wages of the crew and therefore, are not entitled to a preferred maritime lien.

A separate final judgment which contains the amounts each claimant shall receive will be entered pursuant to Fed. R. Civ. P. 58.

So **ORDERED** and **SIGNED** this **1** day of **December, 2011.**

_____
Ron Clark, United States District Judge